THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **3:21-CR-267** |
| | : | **(JUDGE MARIANI)** |
| DAVID DASILVA, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On September 14, 2022, a federal grand jury returned a two-count Indictment charging Defendant David DaSilva with being an Alien in Possession of Firearm and with being an Alien in Possession of Ammunition, both in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). (Doc. 12). Defendant DaSilva subsequently filed a Motion to Dismiss Indictment (Doc. 45) on August 19, 2022, asserting that §§ 922 and 924 violate the Second Amendment and are therefore unconstitutional and that "Congress had no authority to enact these statutes." (Doc. 45). The Government filed a Brief in Opposition to DaSilva's Motion to Dismiss Indictment (Doc. 50). Defendant's motion to dismiss is now ripe for resolution.

For the reasons set forth herein, the Court will deny the Motion to Dismiss Indictment (Doc. 45).

## II. ANALYSIS

DaSilva argues that this case must be dismissed for the following reasons:

. . . the statute which is the basis of this indictment, is unconstitutional on its face, in that it violates the Second Amendment to the Constitution of the United States.  Further, as-applied to Mr. Dasilva individually, the statute must be found unconstitutional as it deprives Mr. Dasilva of his rights to Equal Protection and Due Process of law protected by the Fifth and Fourteenth Amendments to the United States Constitution.

The Defendant further posits that the United States has no jurisdiction in this case, as Congress has no enumerated power to make the statute which is the basis of this indictment.

(Doc. 47, at 1).  The Court will address these arguments in turn.[1]

### A. Whether 18 U.S.C. § 922(g)(5) Violates the Second Amendment

The Second Amendment of the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court, consistent with its precedent, re-affirmed that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *Bruen*, 142 S.Ct. at 2125 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)); *see also, id.* at 2122 ("In [*Heller* and *McDonald*] we recognized that the Second and

---

[1] Although DaSilva asserts that § 922(g)(5) is unconstitutional both facially and as applied to him, Defendant's supporting brief does not set forth with any particularity the basis for his as-applied challenge, separate from his arguments supporting his facial challenge. Defendant therefore has provided no basis for this Court to engage in any separate analysis as to the constitutionality of § 922(g)(5) as-applied to DaSilva.

Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.").

Although the Second Amendment confers an individual right to keep and bear arms, this right is "not unlimited". *Heller,* 554 U.S. at 595, 626. As the Supreme Court in *Heller* explained:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627 (internal citations omitted). *See also, McDonald,* 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here.") (internal citation omitted).

In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test a Court must apply in determining whether a firearm regulation violates the Second

Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text
> covers an individual's conduct, the Constitution presumptively protects that
> conduct. To justify its regulation, the government may not simply posit that the
> regulation promotes an important interest. Rather, the government must
> demonstrate that the regulation is consistent with this Nation's historical
> tradition of firearm regulation. Only if a firearm regulation is consistent with this
> Nation's historical tradition may a court conclude that the individual's conduct
> falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S.Ct. at 2126 (internal quotation marks omitted). *See id.* at 2127 ("the

government must affirmatively prove that its firearms regulation is part of the historical

tradition that delimits the outer bounds of the right to keep and bear arms."); *id.* at 2130 (re-

iterating the standard for applying the Second Amendment). A Court must therefore first

address the threshold question of whether the Second Amendment's plain text covers the

individual's conduct at issue and, if it determines the conduct is covered, engage in an

analysis of whether the Government has affirmatively demonstrated that the regulation at

issue is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the

Government has affirmatively demonstrated that the regulation at issue is consistent with

this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the

inquiry that courts must undertake to assess whether modern firearms regulations are

consistent with the Second Amendment's text and historical understanding "will be fairly

straightforward", *Bruen*, 142 S.Ct. at 2131.

For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*

Nonetheless, the Supreme Court in *Bruen* recognized that while some "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution – and a Second Amendment – intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs. Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132 (internal quotation marks and citations omitted). Thus,

When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy – a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." And because "[e]verything is similar in

> infinite ways to everything else," one needs "some metric enabling the
> analogizer to assess which similarities are important and which are not[.]"

*Bruen*, 142 S.Ct. at 2132 (internal citations omitted).  "[A]nalogical reasoning requires only

that the government identify a well-established and representative historical *analogue*, not a

historical *twin*." *Id*. at 2133 (italics in original).  Further, the *Bruen* Court, while declining to

"provide an exhaustive survey of the features that render regulations relevantly similar

under the Second Amendment", reasoned that

> *Heller* and *McDonald* point toward at least two metrics: how and why the
> regulations burden a law-abiding citizen's right to armed self-defense. As we
> stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the
> *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at
> 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); *see also
> id.,* at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central
> to the Second Amendment right"). Therefore, whether modern and historical
> regulations impose a comparable burden on the right of armed self-defense
> and whether that burden is comparably justified are "'*central*'" considerations
> when engaging in an analogical inquiry.

*Id*. at 2132-2133 (italics in original).

In the present case, Defendant DaSilva recognizes a number of Circuit Court

decisions, discussed *infra*, that have upheld the constitutionality of § 922(g)(5) but argues

that "*Bruen* clearly uproots the framework by which these previous courts have upheld these

statutes in the face of the Second Amendment."  (Doc. 47, at 8-9).  Defendant reasons:

> The Courts should approach the Second Amendment, as it should any
> provision of the Constitution: on the basis of its very language.  The Constitution
> is, after all, a law, the supreme law of the land. It should be examined at face
> value. In the context of any of the bill of rights provisions especially, it is
> imperative to interpret the Constitution in and of itself, not in comparison to the
> pre-constitution framework. The fact that such rights were reduced to writing,

and implanted into the Constitution, consistent with the Constitution's Article V amendment framework, is evidence itself that the framers of such provisions meant not to have such rights beholden to the confines of pre-constitution analogues.

(Doc. 47, at 9-10).

Defendant thus invites this Court to set aside years of Supreme Court and Circuit Court precedent and to examine on a blank slate the constitutionality of § 922(g)(5) in light of the Supreme Court's decision in *Bruen*. However, *Bruen* does not, as Defendant suggests, invalidate or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, and much of the legal reasoning in Circuit Court decisions since *Heller* remains intact. The Supreme Court's decision in *Bruen* did not alter the analyses set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations. In *Bruen*, the Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" that had been applied by the lower courts after *Heller* and *McDonald*, holding that the second-step – application of a "means-end" analysis – "is one step too many." *Bruen*, 142 S.Ct. at 2126-2127. In so doing, the Court emphasized that "[s]tep one of the predominant framework [determining whether regulated conduct falls beyond the Second Amendment's original scope] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. at 2127. The

Supreme Court in *Bruen* took great effort to not undermine its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of those decisions.  *See e.g.*, *Bruen*, 142 S.Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id*. ("*Heller* itself exemplifies" the straight-forward inquiry into the Second Amendment's text and historical understanding); *id*. at 2132-2133 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

In light of the clarifications set forth in *Bruen*, this Court will apply the test set forth therein, to wit, whether the Second Amendment's plain text covers the individual's conduct at issue and, if so, whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation.

The Court thus first looks to whether the Second Amendment's plain text covers DaSilva's conduct.  The Second Amendment protects "the right of the people to keep and bear Arms."  Pursuant to 18 U.S.C. § 922(g)(5), under which DaSilva is charged, "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has

been shipped or transported in interstate or foreign commerce," 18 U.S.C. § 922(g)(5)."[2]

At issue first therefore is whether "possession" of a firearm and ammunition, the conduct at issue here, is encompassed within the right to "keep and bear arms". Applying the strict textual approach mandated by *Bruen*, there can be no dispute that the right to keep and bear arms includes the "possession" of a firearm and ammunition. *See Bruen*, 142 S.Ct. at 2122 (*Heller* recognized that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *Heller*, 554 U.S. at 583 ("the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"); *cf.*, *Have*, Merriam-Webster Dictionary (defining "have" as "to hold or maintain as a possession, privilege, or entitlement.").

However, if DaSilva, an illegal alien, is not included within the "people" entitled to "keep and bear arms" under the Second Amendment, then this Court's inquiry is at an end.

The term "the people" as set forth in the Second Amendment escapes any simple definition. The Supreme Court has suggested that "the people" protected by the Second Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Potentially in

---

[2] DaSilva does not argue that he is not an alien "illegally or unlawfully in the United States", only that he is nonetheless protected by the Second Amendment and that his constitutional rights are being infringed upon.

conflict with this statement, almost 20 years later, the Court in *Heller* stated that there is a

"strong presumption that the Second Amendment right is exercised individually and belongs

to all Americans." *Heller*, 554 U.S. at 580. The Heller Court further repeatedly described

the Second Amendment as protecting "the right of citizens". *See e.g. Heller*, 554 U.S. at

595 ("we do not read the Second Amendment to protect the right of citizens to carry arms

for any sort of confrontation . . ."); *id*. at 635 (the Second Amendment "surely elevates

above all other interests the right of law-abiding, responsible citizens to sue arms in defense

of hearth and home."). Subsequently, in performing its Second Amendment analysis in

*Bruen*, the Supreme Court regularly referred to the Second Amendment rights of "the

people" as belonging to "law-abiding" individuals and "citizens." *See e.g. Bruen*, 142 S.Ct. at

2122, 2132-2133, 2134, 2138, 2150, 2156.

Here, even assuming that DaSilva is broadly encompassed within the definition of

"the people" protected under the Second Amendment, a questionable conclusion,[3] this

---

[3] For example, in *Bruen*, when performing its analysis of the contours of the Second Amendment, the majority in *Bruen* repeatedly, although not uniformly, used the words "law-abiding" and "citizen". *See e.g.*, *Bruen*, 142 S.Ct. at 2122 ("In [*Heller*] and [*McDonald*], we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."); *id*. at 2124-2125 (petitioners "are law-abiding, adult citizens of Rensselaer County, New York"); *id*. at 2134 (petitioners are "ordinary, law-abiding, adult citizens" and are "part of 'the people' whom the Second Amendment protects."); *id*. at 2132-2133 ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."); *id*. at 2138, 2150, 2156 (there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id*. at 2156 (holding that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.") (underlines added). *See also*, *Heller*, 554 U.S. at 635

Nation's historical tradition of firearm regulation nonetheless supports the prohibition on the possession of firearms by illegal aliens.

In 2011, the Fifth Circuit in *United States v. Portillo-Munoz* addressed the issue of whether "the protections contained in the Second Amendment extend to aliens illegally present in this country", noting that this was an issue of first impression that had never been considered by a Circuit Court. *United States v. Portillo-Munoz*, 643 F.3d 437, 439 (5th Cir. 2011). The Fifth Circuit found that the "[Supreme] Court's language in *Heller* [regarding the term 'the people'] invalidates Portillo's attempt to extend the protections of the Second Amendment to illegal aliens. Illegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community,' and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood." *Id*. at 440. The Circuit Court concluded that:

> The courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens. We find that analysis persuasive in interpreting the text of the Second Amendment. Whatever else the term means or includes, the phrase "the people" in the Second Amendment of the Constitution does not include aliens illegally in the United States such as Portillo, and we hold that section 922(g)(5) is constitutional under the Second Amendment.

---

("whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.") (underlines added).

By its very terms, an alien who is illegally or unlawfully in the United States is neither "law-abiding" nor a citizen. Furthermore, Defendant, in failing to properly set forth any as-applied challenge, has not shown how DaSilva can be considered a "part of a national community or [a person] who ha[s] otherwise developed sufficient connection with this country to be considered part of that community," *Verdugo-Urquidez*, 494 U.S. at 265, or an "American" or "citizen", as set forth by *Heller* and *Bruen*.

*Id.* at 442.  That same year, the Eighth Circuit adopted the Fifth Circuit's reasoning and agreed with the Fifth Circuit that the protections of the Second Amendment do not extend to aliens illegally present in the United States.  *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) (*per curium*).

Since 2011, eight Circuit Courts have addressed the issue of whether the Second Amendment right to keep and bear arms applies to individuals unlawfully in the United States.  Although the Circuit Courts' reasonings have varied, every court has upheld the constitutionality of § 922(g)(5).  The Fourth, Fifth, and Eighth Circuits have found that Second Amendment protections do not extend to illegal aliens.  *See United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011).  Although the Second, Ninth, Tenth, and Eleventh Circuits have found that Second Amendment protections *may* extend to illegal aliens, these Circuits declined to conclusively rule on the issue and nonetheless upheld the constitutionality of § 922(g)(5).  *See United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021) (assuming, without deciding, that undocumented aliens have a constitutional right to possess firearms but finding § 955(g)(5) to be a permissible restriction when applied to the facts of the case); *United States v. Torres*, 911 F3d 1253, 1257, 1261 (9th Cir. 2019) (assuming, without deciding, that the Second Amendment extends to unlawful aliens but concluding the statute is constitutional under intermediate scrutiny); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir.

2012) ("We think we can avoid the constitutional question by assuming, for purposes of this case, that the Second Amendment, as a 'right of the people,' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here – and still easily find § 922(g)(5) constitutional."); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (declining to "definitively decide whether Jimenez [an illegal alien] is among 'the people'" because, even assuming he is, as an illegal alien he "may be forbidden from bearing arms while living within our borders" without offending the Second Amendment). Only the Seventh Circuit has definitively found that the Second Amendment grants undocumented individuals the right to bear arms. *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) (finding that an illegal alien is not excluded from the protections of the Second Amendment but that § 955(g)(5) nonetheless constitutes a permissible restriction).

Most recently, one month prior to the Supreme Court's decision in *Bruen*, the Eleventh Circuit engaged in a thorough analysis of the history of the Second Amendment as applied to aliens. The Circuit explained that the history of the "pre-existing right" of "the people" to "keep and bear arms", codified in the Second Amendment, demonstrates that the Second Amendment right extended, and continues to extend, "to some categories of individuals, but not others." *Jimenez-Shilon*, 34 F.4th at 1044 (citing *Heller*, 554 U.S. at 592). Accordingly, the Eleventh Circuit concluded that "as the Supreme Court put it in *Heller*, certain groups of people – even those who might be among 'the people' – may be

13

'disqualified from' possessing arms without violating the Second Amendment", including,

"[b]ased on [the Circuit's] 'examination of a variety of legal and other sources' from the

Founding era,'" illegal aliens. *Id.* (quoting *Heller*, 554 U.S. at 605, 635).

In *Jimenez-Shilon*, the Eleventh Circuit first recognized the difficulty in determining

whether certain illegal aliens may fall within the scope of "the people" "as a general matter".

It thus assumed "for the sake of our decision that [*Jimenez-Shilon*, an illegal alien] is" within

the scope and resolved the case "more narrowly", explaining:

> We are concerned here specifically with the scope and application of the
> Second Amendment, which, as already explained, codified a "pre-existing
> right." *Heller*, 554 U.S. at 592, 603, 128 S.Ct. 2783. And as both the Supreme
> Court and this Court have observed, even individuals who are indisputably part
> of "the people," such as dangerous felons and those suffering from mental
> illness, might not partake of that pre-existing right and, therefore, may be
> prohibited from possessing firearms without offending the Second Amendment.
> *See Heller*, 554 U.S. at 626, 635, 128 S.Ct. 2783; [*United States v. Rozier*, 598
> F.3d 768, 770-71 (11th Cir. 2010)]. Just so here. Even if Jimenez can lay a
> legitimate claim to being among "the people" as a general matter, he – as an
> illegal alien – may be forbidden from bearing arms while living within our
> borders.

34 F.4th at 1045-1046.  In reaching this conclusion, the Eleventh Circuit, in accordance with

*Heller*, "focus[ed] on the Second Amendment's text and history."  *Id.* at 1046.

The Eleventh Circuit engaged in a detailed and lengthy analysis of the text and

history of the Second Amendment, beginning with the "laws of England predating the

Founding".  The Circuit explained that "[a]s was common throughout eighteenth-century

Europe, our English ancestors drew a sharp distinction between the privileges and

immunities of natural-born or naturalized subjects, on the one hand, and aliens, on the

14

other", summarizing that "[t]he former 'ha[d] a great variety of rights,' including 'that of

having arms for their defence, suitable to their condition and degree'" whereas "the rights of

aliens were 'much more circumscribed,' and it was 'left in the power of all states to take

such measures about the admission of strangers as they [thought] convenient.'" *Jimenez-*

*Shilon*, 34 F.4th at 1046-1047 (quoting 1 William Blackstone, *Commentaries on the Laws of*

*England* *143, 259, 371 (1765) and citing *Heller*, 554 U.S. at 593-594)).

      The English view "carried across the Atlantic, where it was well understood that the

right to bear arms 'did not extend to all New World residents.'" *Id.* at 1047 (quoting Joyce

Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140

(1994)).  Some colonial governments "'prohibited any white person unwilling to affirm his

allegiance to the British Crown from collecting firearms'" and later, "'when the political winds

shifted, people who didn't support the Revolution were ordered to turn over their guns.'" *Id.*

at 1047-1048 (quoting Adam Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in*

*America* 116 (2011)).  Quoting Judge Menashi's concurring opinion in the Second Circuit's

decision in *United States v. Perez*, the Eleventh Circuit found that "[i]n both cases, an

individual's 'undivided allegiance to the sovereign' - his 'membership in the political

community' – was regarded as 'a precondition to the right to keep and bear arms.'"

*Jimenez-Shilon*, 34 F.4th at 1048 (quoting *Perez*, 6 F.4th at 462 (Menashi, J., concurring))

(some internal quotation marks omitted).

      Looking to various Framing-era sources, the Eleventh Circuit noted that consistent

with the English and colonial accounts, these sources "'refer to arms-bearing as a *citizen's*

right' that was closely associated with national fealty and membership in the body politic."

*Jimenez-Shilon*, 34 F.4th at 1048 (quoting Note, *The Meaning(s) of "The People" in the*

*Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013)) (emphasis by Eleventh Circuit).  At the

time the Constitution was submitted for ratification, a fear that "the lack of an express

guarantee of the right to bear arms would lead to an erosion of liberty – particularly because

the new charter empowered Congress to call forth the militia and raise an army and navy"

led to proposals in the States "urging the adoption of an amendment explicitly prohibiting

Congress from disarming 'citizens.'" *Id.*

> The Second Amendment seems to have codified this principle. *See Heller*, 554
> U.S. at 592-93, 599, 128 S.Ct. 2783. "It was understood across the political
> spectrum that the right" to keep and bear arms "helped to secure the ideal of a
> citizen militia, which might be necessary to oppose an oppressive military force
> if the constitutional order broke down." *Id.* at 599, 128 S.Ct. 2783. At the same
> time, it helped to secure the citizen's right to self-defense when his government
> was unable (or unwilling) to protect him from private lawlessness. *See id.* at
> 594-95, 128 S.Ct. 2783; Blackstone, *supra*, at *144. But just as it was in both
> England and colonial America, this right did not extend in the same fashion to
> persons outside the national polity. For them, the ability to keep and bear arms
> remained subject to governmental regulation. That is, Congress could lawfully
> restrict the privilege for those who – like illegal aliens today – did not owe or
> swear allegiance to the United States. *See* [Robert H. Churchill, *Gun*
> *Regulation, the Police Power, and the Right to Keep Arms in Early America:*
> *The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 159
> (2007)].

*Id.* at 1048-1049.

The Eleventh Circuit further buttressed its understanding of the parameters and

limits of the Second Amendment by pointing to "additional pieces of historical evidence."

*Jimenez-Shilon*, 34 F.4th at 1049. "First, it is buoyed by the phrasing of many early state

constitutions, which – in northern and southern states alike – expressly limited the right to

keep and bear arms to 'citizens.'" *Id.* (citing state constitutions of Pennsylvania, Kentucky,

Mississippi, Connecticut, Alabama, and Maine). "Second, it is confirmed by a fundamental

tenet of eighteenth-century international law", specifically that "no member of one society

has a right to intrude into another" without permission and that while, aliens who were

"*permitted* to settle and stay in the country" often shared many privileges afforded to

citizens, the "attainment of these rights 'came under a condition – this being that aliens

owe[d] temporary obedience to the United States and its laws.'" *Id.* at 1049 (quoting 1 Emer

de Vattel, *The Law of Nations* § 213, at 101, § 230 at 107 (Joseph Chitty ed., 1883);

Blackstone, at * 259, 370; Patrick J. Charles, *Representation Without Documentation?:*

*Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU

J. Pub. L. 35, 75-76 (2011)) (italics in original).

Several years prior to *Jimenez-Shilon*, the Fourth Circuit in *United States v. Carpio-*

*Leon* also recognized the need to exercise caution in assuming that the Supreme Court

defined "the people" as excluding illegal aliens. 701 F.3d 974, 978 (4th Cir. 2012) (looking

to language used by Supreme Court in *Heller* and *Verdugo-Urquidez* when addressing who

constitutes "the people"). The Fourth Circuit thus declined to "become enmeshed in the

question of whether 'the people' includes illegal aliens or whether the term has the same

scope in each of its constitutional uses" where "*Heller* concludes, through a distinct analysis,

that the core right historically protected by the Second Amendment is the right of self-defense by '*law-abiding,* responsible citizens.'" *Carpio-Leon*, 701 F.3d at 978-979 (some internal quotation marks omitted)(italics in original).  The Fourth Circuit engaged in a historical analysis to conclude that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection." *Id.* at 979.  In a vein parallel to the reasoning of *Jimenez-Shilon*, the Fourth Circuit, having conducted its historical analysis, determined that the disarmament of individuals who were not, or could not be, virtuous members of the community is rooted in the history and tradition of the founding era, a group which includes illegal aliens.  *Carpio-Leon*, 701 F.3d at 979-980.[4]

---

[4] The premise that "unvirtuous" citizens may be prohibited from possessing firearms without having their Second Amendment rights violated has been most commonly applied when analyzing a separate subsection of § 922(g), specifically § 922(g)(1) (felon in possession of a firearm). For example, in *Medina v. Whitaker*, the Court of Appeals for the District of Columbia held that individuals convicted of felonies "are not among those entitled to possess arms", 913 F.3d 152, 159-160 (D.C. Cir. 2019).  In support of this holding, the D.C. Circuit Court looked to the historical rationales set forth in other Circuits:

A number of other circuits have also considered this issue and have concluded that history and tradition support the disarmament of those who were not (or could not be) virtuous members of the community. At least four circuits have endorsed the view that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010). *See also United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *Binderup v. Attorney General*, 836 F.3d 336, 348 (3d Cir. 2016); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012). The "virtuous citizen" theory is drawn from "classical republican political philosophy" and stresses that the "right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)). Several circuits have relied on this theory to uphold the constitutionality of modern laws banning the possession of firearms by illegal aliens and

Although not identical, the basis for the Fourth Circuit's finding is largely consonant

with the Eleventh Circuit's reasoning in *Jimenez-Shilon*. The Fourth Circuit cited to

historical evidence in support of its conclusion that illegal aliens are not protected by the

Second Amendment, including: (1) that "Colonial governments often barred 'potential

subversives' from owning firearms" and that in "several colonial states, refusal to swear

allegiance to the state or the country warranted disarmament"; (2) that "several early

proposals for the Bill of Rights demonstrate the understanding that the core protection of the

Second Amendment belongs to law-abiding citizens"; and (3) the pre-founding English right

to bear arms support the limitation of Second Amendment rights where the right to bear

arms allowed the government to disarm those it considered disloyal or dangerous in

England. *Carpio-Leon*, 701 F.3d at 980. The Fourth Circuit, having engaged in its historical

---

juveniles – classes of people who might otherwise show, on a case-by-case basis, that
they are not particularly dangerous. *See Carpio-Leon*, 701 F.3d at 979-81; *Rene E.*, 583
F.3d at 15. In considering these decisions, we recognize that there is "an ongoing debate
among historians about the extent to which the right to bear arms in the founding period
turned on concerns about the possessor's virtue." *Rene E.*, 583 F.3d at 16. While we need
not accept this theory outright, its support among courts and scholars serves as persuasive
evidence that the scope of the Second Amendment was understood to exclude more than
just individually identifiable dangerous individuals.

*Id.* at 159. *See also*, *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) ("Some of our sister
circuits have found that individuals who have failed to abide by the law or are otherwise 'unvirtuous,' as that
word was understood by the political elite of the Founding generation, are not entitled to *Heller*'s
protections.") (citing Third, Fourth, Eighth, Ninth, and Eleventh Circuit cases); *United States v. Range*, --
F.4th--, 2022 WL 16955670, *6 (3d Cir. 2022) (Third Circuit post-*Bruen* explaining that "[o]ur Court's own
review of the historical record supports the Supreme Court's understanding: Those whose criminal records
evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear
arms. Our previous decisions, endorsed by several sister courts of appeals, have expressed a related view
in terms of the theory of 'civic virtue.'").

inquiry "to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification", and finding that it was not, thereafter declined to engage in a means-end analysis. *See id.* at 977, 982.

Finally, this Court notes the recent concurring opinion in *United States v. Perez*, 6 F.4th 448 (2d Cir. 2021). There, the Second Circuit assumed, without deciding, that undocumented aliens have a constitutional right to possess firearms but, in applying intermediate scrutiny, found § 955(g)(5) to be a permissible restriction when applied to the facts of the case. While concurring in the judgment, Judge Menashi disagreed with the majority opinion's assumption that illegal aliens may have a constitutional right to possess firearms, stating that he would "join those circuits that have straightforwardly concluded that illegal aliens cannot invoke the right of the people to keep and bear arms under the Second Amendment." *Perez*, 6 F.4th at 457 (Menashi, J., concurring); *see id*. at 461 (citing *Carpio-Leon* (Fourth Circuit), *Flores* (Eighth Circuit), and *Portillo-Munoz* (Fifth Circuit)). In support of his position, Judge Menashi looked to the history and traditions during the founding era, incorporating similar examples as those set forth by the Fourth and Eleventh Circuits in *Carpio-Leon* and *Jimenez-Shilon*:

> That the Second Amendment codifies a right belonging to members of the political community is further confirmed by examining its historical antecedents and the practice of "founding-era legislatures." *Kanter* [*v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019)] (Barrett, J., dissenting). In colonial America, the right to keep and bear arms "did not extend to all New World residents." Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 140 (1996). While "[a]lien men ... could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and

exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998).   Consistent with that understanding, both Massachusetts and Virginia made it a crime to arm American Indians who, "[a]s non-citizens, ... were neither expected, nor usually allowed, to participate in the militia." Malcolm, *supra*, at 140. As non-citizens, American Indians were not "entitled to the rights of English subjects," and "[t]heir inability to legally own guns ... confirmed their status as outsiders" to the political community. *Id.* at 141. A Virginia statute from 1756 was even more restrictive, barring Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). That measure, which followed longstanding English practice, was "consistent with the undivided allegiance to the sovereign that had been the definition of membership in the English body politic since the Reformation." Churchill, *supra*, at 157.

Following independence, membership in the political community remained a precondition to the right to keep and bear arms, as "the new state governments ... framed their police power to disarm around a test of allegiance." *Id.* at 159. Pennsylvania barred those who refused to declare their allegiance to the commonwealth from owning arms. *Id.* Several other states followed that practice. *Id.* at 159-60. Those refusing to swear allegiance to their states not only lacked the right to keep and bear arms but also could not vote, hold office, or serve on juries, further indicating their exclusion from the political community. *Id.* State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens.

*Perez*, 6 F.4th at 462-463 (Menashi, J., concurring).

Although not fully set forth herein, this Court finds the Eleventh Circuit's detailed historical analysis to be highly persuasive and incorporates that historical analysis in full. The Court is further persuaded by the Fourth Circuit's reasoning and Second Circuit Judge Menashi's concurring opinion, both of which underscore the comprehensive analysis and

historical accuracy of the Eleventh Circuit's opinion.  Of note, in addition to conducting a

thorough analysis of the Second Amendment's text and history, and codification of the pre-

existing right held by the colonists at the time of the formation of the United States, the

Eleventh Circuit's conclusion that an illegal alien may be disqualified from the protections of

the Second Amendment conforms with the analysis now required by *Bruen*: specifically that

a court should limit its framework for analyzing Second Amendment challenges to the

Amendment's plain text and a determination of whether the regulation at issue is consistent

with this Nation's historical tradition of firearm regulation, without the additional application

of a "means-end" analysis.  *See Jimenez-Shilon*, 34 F.4th at 1052 ("Today's opinion

resolves Jimenez's claim at 'step one.'  As a textual and historical matter, the right to keep

and bear arms did not – and thus does not – extend to illegal aliens.  Having so concluded,

we had no reason to turn to means-ends scrutiny on the back end.") (Newsom, J.,

concurring).  Similarly, the Fourth Circuit's decision in *Carpio-Leon* addressing the

constitutionality of § 955(g)(5) under the Second Amendment is also limited to the

necessary historical analysis and does not engage in the now impermissible means-end

analysis.  *See Carpio-Leon*, 701 F.3d at 977, 982.  Although not identical, the Eleventh

Circuit and Fourth Circuit's collection and application of relevant history and tradition, as

well as Judge Menachi's concurring opinion, present a persuasive and overall uniform

agreement: the rights of those who lack an undivided allegiance to the United States, and

thus do not owe or have sworn such an allegiance and are outside of the membership of the

political community, as well as those individuals who are considered "unvirtuous", have

been circumscribed since the Founding Era of this country.  Illegal aliens, by definition only,

may be considered to lack undivided allegiance to this Nation as well as to be unvirtuous (in

so far as they have entered the United States in violation of the Nation's laws).

This Court's conclusion that § 922(g)(5) is not violative of the Second Amendment

finds support in the Third Circuit's recent decision in *Range v. Attorney General*, --F.4th--,

2022 WL 16955670 (3d Cir. 2022).  There, the Third Circuit rejected an as-applied

challenge to 18 U.S.C. § 922(g)(1), felon in possession of a firearm, where the Appellant

contended that his disarmament was inconsistent with the text and history of the Second

Amendment and was therefore unconstitutional under *Bruen*.  The Third Circuit

summarized:

> Based on history and tradition, we conclude that "the people" constitutionally
> entitled to bear arms are the "law-abiding, responsible citizens" of the polity, . .
> . a category that properly excludes those who have demonstrated disregard
> for the rule of law through the commission of felony and felony-equivalent
> offenses, whether or not those crimes are violent. Additionally, we conclude
> that even if Range falls within "the people," the Government has met its burden
> to demonstrate that its prohibition is consistent with historical tradition.
> Accordingly, because Range's felony-equivalent conviction places him outside
> the class of people traditionally entitled to Second Amendment rights, and
> because the Government has shown the at-issue prohibition is consistent with
> historical tradition, we will affirm the District Court's summary judgment in favor
> of the Government.

*Range*, 2022 WL 16955670 at * 1.  *See also*, *Range*, 2022 WL 16955670 at * 15 ("We

believe the Supreme Court's repeated characterization of Second Amendment rights as

belonging to 'law-abiding' citizens supports our conclusion that individuals convicted of

23

felony-equivalent crimes, like Range, fall outside "the people" entitled to keep and bear arms.").

Looking to *Bruen* to determine whether an individual who is a felon/felon equivalent is included within the Second Amendment definition of "the people", the Third Circuit noted that "[t]he language of *Bruen* provides three insights into pertinent limits on "the people" whom the Second Amendment protects: (1) "the majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"; (2) "the Court clarified that, despite the infirmity of New York's discretionary may-issue permitting regime, 'nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes ... [,] which often require applicants to undergo a [criminal] background check' and 'are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens'"; and (3) "neither *Bruen* nor either of the Court's earlier explanations of the individual right to keep and bear arms casts doubt on § 922(g)(1). . ." *Range*, 2022 WL 16955670 at * 5-6. The Third Circuit further noted that "*Bruen* did not address the substantive issues that we must now determine. Unlike the open-carry licensing regime in *Bruen* that created a conduct-based constraint on public carry,  § 922(g)(1) imposes a status-based restriction – namely, a possession ban on those convicted of crimes punishable by more than one year in prison or by more than two years in prison in the case of state law misdemeanors." *Id.* at * 5. Having conducted a thorough historical review of the prohibition of firearms by felons, the Circuit concluded that

24

"the historical record shows that legislatures had broad discretion to prohibit those who did not respect the law from having firearms."  *Id.*; *see also, id.* at \* 14 (there is a "longstanding tradition of legislation disarming individuals whose actions evince a disrespect for the rule of law.").

The Third Circuit's decision in *Range* is instructive.  Just as with § 922(g)(1), § 922(g)(5) imposes a status-based restriction: a possession ban on any alien who is illegally or unlawfully in the United States.  Drawing from the language of *Bruen*, the Circuit Court's conclusion that "the people" constitutionally entitled to bear arms are the "'law-abiding, responsible citizens' of the polity', *Range*, 2022 WL 16955670 at \* 1, is equally applicable here, where DaSilva, as an illegal alien, is not law-abiding, a citizen, or, as thoroughly explained *supra* by other Circuit Courts, a member of the "polity."  Applying the Third Circuit's reasoning, this Court can easily find that DaSilva falls outside of the plain text of the Second Amendment and is not entitled to its protections.

Even applying a more cautious approach of assuming that DaSilva is encompassed within the term "the people" included in the Second Amendment, this Court's conclusion remains the same – the prohibition on an illegal alien, including DaSilva, from possessing a firearm and ammunition is not unconstitutional under the Second Amendment where the Government has both "provide[d] relevant historical analogues demonstrating a traditional basis for disarming" aliens illegally or unlawfully within the United States and "show[n] that the challenger" is, in fact, an illegal alien.  *See Range*, 2022 WL 16955670 at \* 16.  *See*

*also, id.* ("[E]ven if we were to adopt the contrary view, treating Range as covered by the

Second Amendment's plain text[,] . . . would yield the same result") (internal quotation

marks and citation omitted).   As discussed, *supra*, a substantial historical and traditional

basis from the pre-Founding Era and Founding Era exists which provides well-established

and representative historical analogues to § 922(g)(5) prohibiting an illegal alien from

possessing a firearm and ammunition.   Further, it is undisputed that DaSilva is an alien

unlawfully in the United States.

The Court will thus deny Defendant's motion to dismiss on the basis that § 922(g)(5)

is in violation of the Second Amendment.[5]

---

[5] Defendant DaSilva makes passing arguments, with minimal explanation or analysis, that the statutes at issue in this case also facially violate the Fifth and Fourteenth Amendments. (*See* Doc. 47, at 1, 4-5, 15).  Where Defendant has failed to set forth any substantive basis for his argument, this Court deems those arguments waived.  Nonetheless, this Court notes that several Circuit Courts have addressed similar arguments, all concluding that such Fifth and Fourteenth Amendment challenges lack merit.  For example, although the Fifth Circuit in *Portillo-Munoz* found that Defendant waived his argument that § 922(g)(5) facially and as-applied violated Defendant's Fifth Amendment due process rights, the Court nonetheless explained:

If we were to reach the merits of Portillo's due process claim, we would find his arguments wholly unconvincing. The statute in question is a federal law, not a state law, and thus the Bill of Rights applies directly to the statute without need for incorporation. Since the Second Amendment explicitly provides for a constitutional right to bear arms, Portillo cannot look to the due process clause as an additional source of protection for a right to keep and bear arms.

*Portillo-Munoz*, 643 F.3d at 442 n. 4 (citing *Graham v. Connor,* 490 U.S. 386 (1989)).  In *Carpio-Leon*, the Fourth Circuit also rejected Defendant's argument that § 922(g)(5) violated his right to equal protection under the Due Process Clause of the Fifth Amendment.  That Court, applying rational basis review, identified a number of "legitimate reasons why it would be dangerous to permit illegal aliens to arm themselves."  *Carpio-Leon*, 701 F.3d at 982-983.  The Fourth Circuit, while acknowledging that illegal aliens are "persons" protected by the Fifth Amendment, nonetheless concluded that Congress "surely can rationally distinguish between legal aliens and illegal aliens." *Id*. at 983. *See also*, *Huitron-Guizar*, 678 F.3d at 1167 (Tenth Circuit rejecting Defendant's equal protection argument, finding that Defendant could not meet burden of showing no rational relationship existed between the classification based on alienage

## B. Whether Congress had the Authority to Enact 18 U.S.C. § 922(g)

DaSilva further argues that Congress "had no authority to make the legislation in this case" and specifically that the statute is in violation of the Tenth Amendment of the U.S. Constitution. (Doc. 47, at 10-14). DaSilva recognizes that the "Government's most likely source of authority here is the Commerce Clause" but argues that the Commerce Clause must be narrowly applied so as not to violate the Tenth Amendment. (Id.).[6]

Pursuant to Article I of the U.S. Constitution, "The Congress shall have Power … To regulate with foreign Nations, and among the several States, and with the Indian Tribes", U.S. CONST., Art. I, § 8, cl. 3. The Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power":

> First, Congress may regulate the use of the channels of interstate commerce. . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. . . . Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, . . . i.e., those activities that substantially affect interstate commerce. . . .

United States v. Lopez, 514 U.S. 549, 558-559 (1995) (internal citations omitted). The

---

and a legitimate government end)(quoting Denmore v. Kim, 538 U.S. 510, 522 (2003) (the Supreme Court "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens.").

[6] DaSilva's argument that Congress does not possess the authority to "make the legislation in this case" and that this Court should limit the scope of the Commerce Clause is set forth in broad terms and, while setting forth general case law explaining the contours of the Commerce Clause, fails to state whether Defendant is challenging Congress' authority to enact § 922, § 922(g), or simply the subsection at issue here, § 922(g)(5). Regardless, where this Court finds that Congress constitutionally exercised its power under the Commerce Clause in enacting § 922(g), including § 922(g)(5), this ambiguity is not material.

Supreme Court has thus upheld "regulations of activities that arise out of or are connected

with a commercial transaction, which viewed in the aggregate, substantially affects

interstate commerce," *Lopez*, 514 U.S. at 561.

Here, DaSilva points to the Supreme Court's decision in *Lopez* in support of his

assertion that this Court should find § 922(g) to be in violation of the Constitution.  In *Lopez*,

the Supreme Court held that the Gun-Free Zones Act exceeded Congress' authority under

the Commerce Clause, summarizing:

> The possession of a gun in a local school zone is in no sense an economic
> activity that might, through repetition elsewhere, substantially affect any sort of
> interstate commerce. Respondent was a local student at a local school; there
> is no indication that he had recently moved in interstate commerce, and there
> is no requirement that his possession of the firearm have any concrete tie to
> interstate commerce.

*Lopez*, 514 U.S. at 567.   Relying on this case, and Justice Thomas' concurrence therein,

Defendant asserts that "[i]n permitting Congress to regulate 'any activity, which in the

aggregate would have an effect on interstate commerce', the [Supreme] Court has

effectively done away with the Tenth Amendment's very clear limitations on the regulatory

power of Congress" and thus the "Courts should utilize this case as an opportunity to revisit

the grave mistake which the Supreme Court made in 1942, and overturn *Wickard v. Filburn*,

as the plain meaning of the Constitution obviously intends."[7]  (Doc. 47, at 14).

---

[7] In *Wickard v. Filburn*, 317 U.S. 111 (1942), the Supreme Court upheld the application of
amendments to the Agricultural Adjustment Act of 1938, "explicitly reject[ing] earlier distinctions between
direct and indirect effects on interstate commerce."  *Lopez*, 514 U.S. at 556.

Defendant's request that this Court reject 80 years of Supreme Court and Circuit Court precedent is extraordinary, particularly in light of Defendant's failure to provide this Court with any substantive argument to support his position and instead offering only sweeping and generalized statements of what counsel believes should be, but admittedly is not, the law.

As previously set forth, 18 U.S.C. § 922(g)(5), under which DaSilva is charged, provides that "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," 18 U.S.C. § 922(g)(5).  In *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001), the Third Circuit examined a separate subsection of 18 U.S.C. § 922(g), specifically subsection (1), which provides as follows: "[i]t shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," 18 U.S.C. § 922(g)(1).  The Third Circuit found that the jurisdictional element in § 922(g) "distinguishes it from the statutes considered in *Lopez* and [*United States v. Morrison*, 529 U.S. 598 (2000)]," because "by its very terms, [§ 922(g)], only regulates those weapons affecting interstate commerce by being

29

the subject of interstate trade" and "addresses items sent in interstate commerce and the channels of commerce themselves, delineating that the latter be kept clear of firearms." *Singletary*, 268 F.3d at 204.  Following careful analysis, the Third Circuit concluded that § 922(g)(1) was a proper exercise of Congress' regulatory power under the Commerce Clause.[8]  The Third Circuit further noted that its conclusion that § 922(g)(1) does not "lie[] beyond Congress' Commerce Clause power" joins that of eight other circuits, "all of which have readdressed this issue in the wake of *Morrison* and [*Jones v. United States*, 529 U.S. 848 (2000)]."  *Id*. at 205.  *See also, United States v. Latu*, 479 F.3d 1153 (9th Cir. 2007) (rejecting defendant's argument that § 922(g)(5) presents an unconstitutional extension of Congress' power to regulate interstate commerce and finding that "[u]nlike the statutes at issue in *Lopez* and *Morrison*, § 922(g) contains a jurisdictional element, specifically requiring that [Defendant's] possession be 'in or affecting commerce' [and t]he presence of the jurisdictional element satisfies the Commerce Clause concerns articulated in *Lopez*.").

Where the Third Circuit, consistent with a majority of other Circuits, has clearly and unequivocally held that Congress constitutionally exercised its power under the Commerce Clause in enacting § 922(g), this Court is bound by that holding and will deny Defendant's motion to dismiss on the basis that "Congress had no authority to make the legislation in this case" (Doc. 47, at 10).

---

[8]  Although the Third Circuit in *Singletary* specifically addressed § 922(g)(1), the jurisdictional element is the same for each subsection of § 922(g).

### III. CONCLUSION

For the reasons set forth herein, Defendant DaSilva's Motion to Dismiss Indictment

(Doc. 45) will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge